IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 14, 2006

## ANDRE KEITH MAYS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 99-D-2341      Steve Dozier, Judge**

**No. M2005-01658-CCA-R3-PC - Filed April 11, 2006**

A Davidson County jury convicted the Petitioner of two counts of first degree murder, two counts of especially aggravated robbery, and one count of attempted first degree murder. The Petitioner was sentenced to life plus an additional fifty years. The Petitioner filed a petition for post-conviction relief, which the post-conviction court dismissed. On appeal, the Petitioner contends that, because his trial counsel was ineffective, the post-conviction court erred when it dismissed his petition. Finding no reversible error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Jefre S. Goldtrap, Nashville, Tennessee, for the Appellant, Andre Keith Mays.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. (Torry) Johnson III, District Attorney General; Jon Seaborg, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I. Facts**
**A. Facts on Direct Appeal**

As set forth in our Court's opinion on direct appeal, the proof at the Petitioner's trial established the following facts:

On June 29, 1999, the Appellants, Andre Mays and Cortez Bennett, were together with Eric Booth and Tywaun Morrow drinking. Earlier that day, they had "snorted cocaine and smoked marijuana laced with cocaine." During the evening, Mays discussed with the others the robbery of Tonya and Wesley Tyler Sr. at their

residence in Nashville.  Booth drove to the area and parked several houses away from the Tylers' residence. Morrow and the Appellants exited the vehicle and went towards the house.  Bennett was carrying a "tech nine," a large handgun, and Mays had a small caliber revolver.  Morrow returned to the car shortly thereafter.

Around 11:00 p.m., Wesley Tyler Sr. heard his dog barking. He went downstairs to quiet the dog; while downstairs, Mr. Tyler heard his wife call his name. Mr. Tyler then proceeded upstairs and, as he came up the steps, he "saw [Petitioner] there with a gun on [his two] children there on the floor."  Another child was asleep in a bedroom.  Hearing Mr. Tyler come up the stairs, Bennett, who was wearing a ski-mask, pointed the gun at him.  Mr. Tyler turned and ran back downstairs but stopped when he heard Mays call his name.  Mr. Tyler recognized Mays['] voice, having previously met him several times.  Mays pointed a gun at Mr. Tyler, told him to "shut up," and forced him upstairs.

Mays took money from the Tylers' dresser and then asked, "[W]here's the safe?" Mrs. Tyler responded that the safe was downstairs.  Mr. Tyler offered to go get it, but Mays grabbed Mrs. Tyler and forced her downstairs.  He stated to Mr. Tyler that he "was going to take care of [him] later."  Bennett stayed in the living room with the children and Mr. Tyler.  After several minutes had passed, Mays and Mrs. Tyler returned upstairs with the safe.  Then, Mays and Mrs. Tyler went to her bedroom to retrieve the key. Upon their return to the living room, Mr. Tyler said, "you've got everything, you know, that we can give you.  I mean, man, just take it and go." Mays then told Bennett to "hold on [before leaving the residence], . . . I'm going to take care of a little business first."  Mays asked for Bennett's gun, and Bennett refused. Mays ordered Mr. and Mrs. Tyler to stand up and go into the bathroom.  Mr. Tyler sat in the tub, and Mrs. Tyler sat on the toilet.  Mays followed the couple into the bathroom, and Bennett stood outside the bathroom doorway.  Mr. and Mrs. Tyler began to pray. Mays proceeded to shoot Mr. Tyler three times in the head. Mr. Tyler "laid over as if [he] was dead, but [he] wasn't dead."  Mays then turned the gun on Mrs. Tyler and shot her twice in the head.  The Appellants ran from the residence, carrying a small grey safe and guns.

Mr. Tyler, hearing his children "running around," got out of the tub and checked on his wife, who was not moving.  He then crawled into the kitchen and phoned 911, but he was unable to speak because his vocal cords and jawbone were damaged. Wesley Tyler Jr., then five years old, spoke with the 911 officer and gave her the pertinent information. Both Mr. and Mrs. Tyler were transported to the hospital for treatment. Mrs. Tyler died as a result of her injuries; however, Mr. Tyler survived. During the ambulance ride to the hospital, Mr. Tyler wrote on a bag, "Dre from north Sixth shot me." [FN1]

FN1. At trial, testimony established that Mays, whose first name is

-2-

Andre, is commonly referred to as Dre.

After leaving the residence, the Appellants and Booth and Morrow drove to a nearby Nashville residence and divided the money. The Appellants and Booth returned to the car and, in a nearby alley, threw out the revolver, the safe, some gloves, and a dark shirt. Subsequently, Wesley Tyler Sr. and Jr. identified Mays from a photo array, but only Wesley Tyler Sr. was able to identify Bennett from a photo array. Rings, belonging to Tonya Tyler, were discovered in Mays' pocket.

All four men were arrested and, on October 19, 1999, were indicted for Count I, first degree murder of Tonya Tyler; Count II, felony murder of Tonya Tyler; Count III, especially aggravated robbery of Tonya Tyler; Count IV, attempted first degree murder of Wesley Tyler Sr.; and Count V, especially aggravated robbery of Wesley Tyler Sr. After a trial by jury, Bennett and Mays were found guilty of all charges. Count II was merged with Count I, and the Appellants received a total sentence of life imprisonment plus fifty years. This appeal followed.

State v. Andre Mays and Cortez Bennett, No. M2001-02151-CCA-R3-CD, 2002 WL 31385939, at *1-2 (Tenn. Crim. App., at Nashville, Oct. 22, 2002), *perm. app. denied* (Tenn. Feb. 24, 2003). In that opinion on direct appeal, this Court affirmed the Petitioner's convictions and sentences.

### B. Post Conviction Facts

The Petitioner timely filed a petition for post-conviction relief, and the post-conviction court appointed counsel for the Petitioner. At a hearing on the Petitioner's petition for post-conviction relief, the following evidence was presented: Counsel testified that he met with the Petitioner on numerous occasions and explained that he investigated this case thoroughly as it was "one of the most serious cases [he] had." Counsel acknowledged that he reviewed all the police reports and information provided in discovery and testified that he provided the Petitioner with updated copies of everything that he obtained. When asked about potential alibi witnesses, Counsel explained that, after the Petitioner's co-defendant raised an alibi defense that involved two women the Petitioner told him that the Petitioner had spent time with two different women. Counsel said that he subpoenaed these two females but could not find them. Counsel said that he discussed different legal strategies with the Petitioner, including the Petitioner's right to testify at trial. Counsel did not recall raising any issues about a speedy trial, but he described how he investigates such issues and raises them when appropriate. Counsel could not recall whether this case entailed any issues of prosecutorial misconduct for failing to provide exculpatory information or for failing to provide alibi witnesses. He explained that, in the days leading up to trial, defense attorneys often receive new information, but he did not see misconduct on anyone's part with regard to this case. He further testified that he discussed with the Petitioner every issue of which he could conceive.

On cross-examination, Counsel testified that, several days before trial, he received an audiotape from the State that contained statements made by the two female alibi witnesses. He said that, prior to receiving this tape, the Petitioner told him that the Petitioner was with these two women

after the incident. He said that if the Petitioner had brought forth information regarding these alibi witnesses earlier, then Counsel would have pursed the information earlier. Counsel testified that the Petitioner never told him that the Petitioner was with the two women during the crime. Counsel explained that he hired Bobby Brown as a private investigator for this case and paid for the investigator with his own money. Counsel acknowledged that the dead victim's wedding rings were found in the Petitioner's pockets and that the victims' child had identified the Petitioner as a perpetrator of the crime. Counsel testified that, during his discussions with the Petitioner, the Petitioner insisted that a jury would find him innocent despite all the evidence implicating him. He further testified that the Petitioner tried to assert that the co-defendant was the shooter, but the Petitioner could never show that he was not involved with the crime. Counsel described how he had been practicing criminal law for seventeen years and how he had previously handled at least fifty murder cases. The post-conviction court agreed that Counsel could file his time sheets regarding this case after the hearing.

The Petitioner testified that Counsel visited him and discussed different plans and strategies for the trial. He explained that he found discrepancies in the discovery material and pointed them out to Counsel, but Counsel did not fully explore these discrepancies at trial. The Petitioner testified that he asked Counsel to ask for a bench trial, that Counsel agreed to make this request, but Counsel "never got it done." The Petitioner testified that he was not aware of any investigator being involved in his case.

On cross-examination, the Petitioner testified that he assumed that he had a pretty good relationship with Counsel and that Counsel spent a little time with him. He said that Counsel only pretended to listen to him.

Based on the foregoing evidence, the post-conviction court dismissed the Petitioner's petition for post conviction relief, finding that: Counsel "represented the [P]etitioner with vigor and zealousness. [Counsel] was effective and did an outstanding job as usual in light of the difficult facts and evidence surrounding the [P]etitioner's case."

## II. Analysis

On appeal, the Petitioner contends that the post conviction-court erred when it dismissed his petition because Counsel was ineffective. Specifically, the Petitioner alleges that: (1) Counsel failed to adequately discuss the case with him; and (2) Counsel was unprepared for trial and was thus ineffective. The State counters that Counsel's representation was well within the range of competence required of attorneys in criminal cases.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2003). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions

concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999); Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to de novo review. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); Burns, 6 S.W.3d at 461; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the Petitioner must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the Petitioner by the Sixth Amendment. Second, the Petitioner must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the Petitioner of a fair trial, a trial whose result is reliable. Unless a petitioner makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

State v. Melson, 772 S.W.2d 417, 419 (Tenn. 1989). In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citing Strickland v. Washington, 466 U.S. 688 (1984)). When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988).

The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect

-5-

representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794 (1987) (quoting United States v. Cronic, 466 U.S. 648, 665, n.38 (1984)).

Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House, 44 S.W.3d at 515 (citation omitted); Thomas Brandon Booker v. State, No. W2003- 00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. Jun. 21, 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; Nichols v. State, 90 S.W.3d 576, 587 (Tenn. 2002). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

## A. Failure of Counsel to Adequately Discuss Case with Petitioner

The Petitioner alleges that Counsel failed to adequately discuss the case with him. The State counters that Counsel was entirely effective in his representation of the Petitioner. The post-conviction court accredited Counsel's testimony and found that Counsel provided the Petitioner with effective representation. The evidence in the record does not preponderate against the findings of the post-conviction court. The record reflects that Counsel discussed all possible strategies and defenses with the Petitioner. Counsel testified that he discussed every conceivable issue with the Petitioner. Further, Counsel and the Petitioner discussed the evidence against the Petitioner, and the Petitioner expressed his opinion that he would be found not guilty even in the face of the evidence. Counsel provided the Petitioner with copies of discovery material, and the two discussed possible alibi witnesses. The Petitioner admitted that Counsel listened to him and met with him regularly. The Petitioner said that he assumed that he had a good relationship with Counsel. Nothing in the record suggests that the Petitioner either received the ineffective assistance of counsel or was thus prejudiced. The Petitioner is not entitled to relief on this issue.

**B. Counsel's Trial Preparations**

The Petitioner alleges that Counsel was unprepared for trial and was thus ineffective. The State counters that the record supports the post-conviction court's finding that Counsel was prepared for trial. The post-conviction court accredited counsel's testimony and found that Counsel provided effective representation. The record does not preponderate against the findings of the post-conviction court. The record shows that Counsel spent significant time with the Petitioner and that Counsel adequately pursued all of the Petitioner's meritorious defenses. Counsel testified that he recognized the seriousness of this case and investigated this case thoroughly. Counsel even hired a private investigator with his own funds. Counsel's time sheet corroborates his testimony that he spent a sufficient amount of time to prepare for trial. The Petitioner failed to provide any evidence which indicates that Counsel was unprepared for trial. The post-conviction court accredited Counsel's testimony, and this Court will not re-weigh the credibility findings of the post-conviction court. Therefore, the Petitioner is not entitled to relief on this issue.

## III. Conclusion

In accordance with the foregoing authorities and reasoning, the judgement of the post-conviction court is affirmed.

_____
ROBERT W. WEDEMEYER, JUDGE

-7-